IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| DASHAWN O. GIBBS, | CIVIL ACTION NO. 9:09-1081-HFF-BM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |



The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein he was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in July 22, 2002 (protected date), alleging disability as of June 26, 2002 due to below the knee amputation, back pain, headaches, allergies and depression. (R.pp. 90-91, 484, 696-699). Plaintiff's claims were denied initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on February 25, 2004. (R.pp. 491-530). The ALJ thereafter denied Plaintiff's claims in a decision issued November 1, 2004.

(R.pp. 51-63). The Appeals Council thereafter denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner.

Plaintiff then filed an action in United States District Court (Gibbs v. Astrue, Civil Action No. 4:06-1977), which resulted in a remand of the case to the Commissioner for further proceedings. (R.p. 582-597). A new hearing was held before the ALJ on October 14, 2008; (R.pp. 690-728); following which the ALJ again denied Plaintiff's claims in a decision issued November 5, 2008. (R.pp. 556-577). Plaintiff thereafter failed to request a timely review by the Appeals Council, and was notified by the Appeals Counsel on February 17, 2009 that the ALJ's decision was the final decision for purposes of judicial review. (R.pp. 548-550).

Plaintiff then filed this current action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for an award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular



2

conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)).

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## Discussion

A review of the record shows that Plaintiff, who was twenty-seven (27) years old when he alleges his disability began, has a tenth grade education with past relevant work as a landscaper and dredge boat worker. (R.pp. 692, 694, 696-697). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for at least twelve (12) consecutive months.

After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff suffers from the severe impairments[1] of status-post right above the knee amputation, degenerative disc disease, and depression, rendering him unable to perform any of his past relevant work, he nevertheless retained the residual functional capacity (RFC) to perform a

---

[1] An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987).

3



limited range of sedentary work activity[2] and is therefore not entitled to disability benefits.[3] Plaintiff asserts that in reaching this decision, the ALJ erred in making an improper credibility assessment with respect to Plaintiff's subjective testimony as to the extent of his pain and limitation. Plaintiff also contends that the testimony of the Vocational Expert is inadequate to sustain a finding that employment exists in the economy which Plaintiff is capable of performing. However, after careful review and consideration of the record and arguments presented, the undersigned finds and concludes that the decision of the Commissioner is supported by substantial evidence, and should therefore be affirmed.

The medical record reveals that Plaintiff was injured in an automobile accident on June 27, 2002, which eventually resulted in the amputation of his right leg above the knee. (R.pp. 166, 204-214). During his recovery period, he was dropped by emergency medical technicians, following which Plaintiff reported a significant increase in his pain. (R.p. 346).

---

[2] Sedentary work is defined as lifting no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2005).

[3] For purposes of DIB eligibility, a claimant must show that he or she became disabled prior to the expiration of his or her insured status. See 42 U.S.C. § 423(c); 20 C.F.R. § 404.101 (2009). Plaintiff does not dispute that his eligibility for DIB expired on December 31, 2007. Therefore, in order to obtain DIB, he must show that he was disabled on or before that date. However, although the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot establish that [ ] he was disabled during the insured period for DIB may still receive SSI benefits if [] he can establish that [] he is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542, 2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005). See also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir. 1999)[Discussing the difference between DIB and SSI benefits]. Under SSI, the claimant's entitlement to benefits (assuming they establish disability) begins the month following the date of filing the application forward. Pariseau v. Astrue, No. 07-268, 2008 WL 2414851, * 13 (D.R.I. June 13, 2008); see 20 C.F.R. § § 416.202(g), 416.203(b), 416.335 (2009).



4

Plaintiff was treated by Dr. Jeffery Buncher following his accident. At an examination on September 2, 2002 (a few weeks after his above the knee amputation on July 13, 2002), Plaintiff was unable to ambulate freely and reported to Dr. Buncher's office in a wheel chair. Physical examination showed Plaintiff to be a well developed male who exhibited spasms and tenderness to palpation of the thoracic spine from T8 to T11 bilaterally and lumbar spine from L1 to L5 bilaterally. There was also spasm and pain to palpation of the trapezius muscles bilaterally, with pain on palpation in the right lower extremity. Plaintiff also exhibited pain on inversion and plantar flexion of the left ankle. However, Plaintiff had 5/5 (full) strength in the upper and lower extremities with the exception of the right knee, which was decreased secondary to the below the knee amputation. Deep tendon reflexes were equal and bilateral in both the upper and lower extremities, and Plaintiff had full cervical range of motion, although dorsolumbar range of motion was associated with and limited by pain in flexion and extension. Plaintiff was diagnosed with a thoracic sprain/strain, lumbar sprain/strain, bilateral trapezius sprain/strain, and worsening of his below knee amputation discomfort as a result of the accident. It was recommended that he receive therapy three times a week and that he be placed on a rehabilitative exercise program. (R.pp. 346-347).

On September 10, 2002, State Agency Physician Dr. Samuel Morgan reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment, wherein he determined that Plaintiff could perform sedentary work with the ability to stand and/or walk for a total of at least two hours in an eight hour work day, sit about six hours in an eight hour work day, with a limitation in his right lower extremity and some other posterial limitations. (R.pp. 232-239). Plaintiff continued thereafter to been by Dr. Buncher, with Dr. Buncher opining on December 16, 2002 that Plaintiff was disabled at that time (five (5) months post-surgery) because



he was confined to a wheelchair and unable to ambulate freely. Dr. Buncher further opined that Plaintiff continued to experience significant pain throughout his spine, and that they were encouraging him to work with his prosthetic limb. (R.pp. 326-328).

An MRI taken during this period found normal marrow signal and normal bony alignment in the cervical spine with no evidence of a congenital anomaly of the spine and visualized paraspinal soft tissues within normal limits. Plaintiff did have mild to moderate left paracentral disc herniation at C5-6 impinging upon and mildly flattening the left interior aspect of the spinal cord. (R.pp. 320-321).

On February 5, 2003 Plaintiff was examined by Dr. John Custer. It was noted that Plaintiff had driven himself to the examination, even though he did not have a drivers license. Plaintiff's chief complaint was that he had "an anger problem", apparently because he had not obtained disability. Plaintiff reported that he "cannot cope with not having a leg", and that he had "suicidal thoughts at times". Plaintiff reported that, although he suffers from pain and allergies, he quit taking his medications "because he gets frustrated", but he would usually "go back on them". Dr. Custer reported that Plaintiff had never had any type of psychiatric treatment, and although Plaintiff had been referred to see a psychologist, he had refused to go. He was taking Neurontin for phantom limb pain, and reported that he was having difficulty focusing and was not interested in doing much, stating "what can I do?" Plaintiff stated that he drank half a pint or two of cognac every day, and also smoked marijuana. Plaintiff reported that he had a "rap sheet", but did not really "feel that bad about it." Plaintiff related a history of drug charges, including trafficking crack cocaine, but stated that "he had quit that type of life style and was working a legitimate job."

Plaintiff did not like his prosthetic leg because it was "too hard" for him to use. Instead, Plaintiff ambulated using crutches. Dr. Custer found Plaintiff's affect varied from being



6

angry to being somewhat proud of himself, with a contempt notable for a complete lack of remorse regarding his past actions or criminal activities. There was no evidence of psychosis, no suicidal or homicidal ideation, and Dr. Custer found Plaintiff's attention and concentration to both be good. He was able to understand directions for several sevens, making only one error out of six, although his insight was "quite poor". Dr. Custer opined that Plaintiff had classic sociopathic traits which would likely impair his recovery from his injury, as would his substance abuse. He was strongly encouraged to seek psychiatric intervention, and to discuss these issues with his current treating physician. (R.pp. 261-264).

On February 12, 2003, Plaintiff was examined by orthopedist Dr. Mason Ahearn. Plaintiff reported that he was still being treated by Dr. Buncher with physical therapy and medications, that he rarely used his crutches, preferring his wheelchair, and that although he had a prosthesis he said that it hurt to use it. On examination Plaintiff's cervical motion was limited twenty five percent in all plains due to guarding, although Dr. Ahearn palpated no cervical muscular spasm. Spurling's and spinal compression were negative, and a neurological examination of the upper extremities revealed circumferential measurements of arms equal at twenty eight centimeters and forearms at twenty seven centimeters. Dr. Ahearn saw no evidence of intrinsic atrophy on the left side, no sensory deficits, and Plaintiff had normal deep tendon reflexes. Plaintiff's stump was found to be well healed, although his lumbar motion was not assessed, and his neurologic examination of the left lower extremity was within normal limits to include deep tendon reflexes. Dr. Ahearn opined that it was difficult to assess Plaintiff from a functional standpoint, as he would be much more functional if he could achieve independent ambulation on a prosthesis, which Dr. Ahearn said was "certainly possible". Dr. Ahearn further opined that Plaintiff seemed "to have no problems with his upper extremities", although he believed Plaintiff had "psychological problems."



While Dr. Ahearn believed Plaintiff was probably not gainfully employable at that point, "prosthetic and general rehabilitative management goal directed rather than just supportive might certainly change that situation significantly." (R.pp. 265-266).

On February 26, 2003, Plaintiff had both physical and mental residual functional capacity assessments completed by State Agency Officials. With respect to Plaintiff's physical functional capacity, a physician [signature illegible] found after review of Plaintiff's medical records that he was capable of sedentary work with the ability to stand and/or walk at least six hours in an eight hour work day, limited in his lower extremities due to above knee amputation, and occasionally being limited by postural limitations except for climbing ladders, ropes or scaffolds, which he could never do. Plaintiff was also limited to occasional reaching in all directions (including overhead), but had no other manipulative limitations. (R.pp. 269-276). With respect to Plaintiff's mental functional capacity, Dr. Judith Von opined after review of Plaintiff's medical records that he was moderately limited in his ability to work in coordination with or proximity to others without being distracted, in his concentration and persistence and ability to interact appropriately with the general public, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but was not otherwise significantly limited. Dr. Von found no cognitive impairment, and that Plaintiff would best be suited for a solitary job with no contact with the public and little interaction or dealing with coworkers, but could otherwise sustain a typical work routine. (R.pp. 277-279).

Plaintiff continued to be seen by Dr. Buncher, who noted "slow improvement" although Plaintiff continued to complain of pain and received medications. On February 24, 2003, it was noted that Plaintiff wanted to start walking with his prosthesis. (R.p. 310). Although Dr. Buncher reported on March 12, 2003, that Plaintiff was not motivated to use his prosthesis, by March

8



28, 2003 it was noted that Plaintiff had been using his prosthesis "every day". (R.p. 308). Plaintiff also apparently frequently received massages on his visits to Dr. Buncher. (R.p. 296, 307). See generally, R.pp. 295-319.

On November 18, 2003, Dr. David Morrow found on examination that Plaintiff's hip moved quite well and that his prosthesis seemed to be fitting well. Even though Dr. Morrow noted no swelling or erythema, and that Plaintiff had no shiny reflex sympathetic dystrophy type appearance, Plaintiff complained of tenderness and irritation on the incision side of his amputation. Dr. Morrow opined that Plaintiff's complaints of right leg tenderness were "above what we would expect from light touch." (R.p. 294).

On March 12, 2004, clinical psychologist Dr. Randolph Waid wrote Dr. Buncher a letter noting that he had been asked to consult with the Plaintiff, and that Plaintiff had initially been seen in his office on April 8, 2003. Dr. Waid reported that Plaintiff had undergone an initial consultation and interview at that time, but had failed to follow through on follow up appointments and was not seen again until March 6, 2004. Dr. Waid noted that Plaintiff was now utilizing a prosthetic leg, but continued to complain of persistent pain affecting his right lower extremity and left knee as well as in the back associated with a herniated disc. Plaintiff reported that he had been tried on a variety of medications and had numerous treatments including acupuncture, massage, use of electrical stimulation, as well as the Matrix machine. Dr. Waid reported that a structured symptom review failed to reveal any complaints with sensory perceptual functions, although Plaintiff continued to experience mild coordination/balance problems as he continued to adjust to the right prosthetic leg. Plaintiff reported numbness and parasthesis as well as phantom pain affecting the right lower extremity, which was aggravated by extended ambulation, and also complained of headaches and "considerable cognitive difficulties including concentration and memory problem."

9



Dr. Waid reported evidence of "episodic depression", although Plaintiff was not suicidal, with Plaintiff describing himself as being tense with an easy anger and irritability. Plaintiff reported being "quite pleased" with some of the techniques being used to treat his complaints, "including use of the Matrix machine", although his usage of his prescription medications was described as being "variable" due to lack of finances and Plaintiff's believing that he was "immune to them". Plaintiff's personality assessment inventory was consistent with an individual who was "quite negative about his current life", with Plaintiff exhibiting ongoing pain and somatic difficulties, depression, discouragement, and social withdrawal, a discomforting level of anxiety and tension, and recurrent anxiety associated with his involvement in the traumatic event. Dr. Waid reported that Plaintiff's responses to the multidimensional pain inventory failed to reveal a dysfunctional profile (i.e., an individual exaggerating his pain difficulties), with the Plaintiff reporting that he experienced moderately intense pain that had an extreme interference in his ability to perform day to day activities. Dr. Waid opined that Plaintiff did not appear to be compliant with antidepressant medication likely due to negative side effects, although he did continue to use Neurontin. Dr. Waid believed that phantom pain persisted, but that with appropriate education Plaintiff would be a good candidate for continuing management of his pain difficulties via medications. (R.pp. 477-479).

X-rays over the course of 2004 through 2007 revealed mild degenerative changes in Plaintiff's neck, while x-rays of his lower back were unremarkable. Plaintiff's left knee was basically normal with the exception of a small developing cyst. (R.pp. 641, 656, 658). Plaintiff had a brief hospital stay in August 2007 with complaints of suicidal thoughts, during which examination of his stump revealed that it was "in very good condition". (R.pp. 661, 671). During an examination at the Nason Medical Center on April 9, 2008, for complaints of body pain, Plaintiff was found on



examination to be well nourished and well developed, with a normal musculature, no skeletal tenderness or joint deformity, normal appearing extremities (other than noted right leg amputation) with no edema or cyanosis, and no unusual anxiety or evidence of depression. Plaintiff advised that he was going to therapy per Dr. Buncher and that he "does go to the gym". No restrictions or functional limitations were noted. (R.p. 639-640).

At his hearings before the ALJ, Plaintiff testified that he suffered from phantom limb pain as well as pain in his left leg, that he primarily used a wheelchair while at home because he was not comfortable with his prosthesis, that the also suffered from back pain every day for which he took medication, and that he had had problems with depression. At his second hearing, Plaintiff testified that the wearing of the prostheses caused his stump to dry and chaff and become "like alligator skin", causing itching and burning pain, and that every two or three hours he had to go through a forty-five minute procedure of cleaning, disinfecting and moisturizing his stump. See generally, R.pp. 498-501, 507, 512-513, 700-703.

After review and consideration of the medical evidence as well as Plaintiff's subjective testimony, the ALJ determined that Plaintiff retained the residual functional capacity to perform sedentary work, with the ability to sit for six hours in an eight hour day; stand/walk for two hours in an eight hour day; frequently lift/carry light items; and occasionally lift ten pounds; never climb, crawl, balance or kneel; occasionally crouch and stoop; and never operate foot pedals. Plaintiff would also have to have a sit/stand option at will and work in a low stress setting (defined as no more than occasional decision making and changes in the work setting) with no exposure to the general public. (R.pp. 564-565). After careful review and consideration of the record in this case and the arguments presented, the undersigned finds that substantial evidence supports these findings; Hays, 907 F.2d at 1456 [Defining substantial evidence as evidence which a reasoning mind would



accept as sufficient to support a particular conclusion]; as the medical records and opinions of Plaintiff's treating and consultative physicians provide substantial evidence to support the functional capacity found by the ALJ; see Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996) [noting importance to be accorded treating physician's opinion]; Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) [ALJ may properly give significant weight to an assessment of an examining physician]; Richardson v. Perales, 402 U.S. 389, 408 (1971) [assessment of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability]; as do the findings of the state agency physicians who reviewed Plaintiff's condition. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986) [opinion of a non-examining physician can constitute substantial evidence to support the decision of the Commissioner].

In reaching his decision, the ALJ noted inconsistencies in Plaintiff's claims, that the medical records showing no evidence of atrophy in Plaintiff's left lower extremity and that his right stump was well healed, that Plaintiff was able to achieve ambulation with a prosthesis, that Plaintiff was generally prescribed only conservative medical treatment for his complaints, that x-rays consistently revealed only minimal findings, and that there were no records to document that Plaintiff had ever undergone any mental health counseling or therapy. He had in fact refused to go to a psychologist. Plaintiff also had a history of being non-compliant with his medications. (R.pp. 565-573). See generally, Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995)["Failure to seek aggressive medical care is not suggestive of disabling pain."]; Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992)[Generally conservative treatment not consistent with allegations of disability]; Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003)[Evidence that a claimant is exaggerating symptoms can be considered as part of the evaluation of Plaintiff's subjective complaints]; Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989) ["the mere fact that working may cause pain or



12

discomfort does not mandate a finding of disability"]; Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ["[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss."]; Foster v. Bowen, 853 F.2d 483, 489 (6th Cir. 1988) [A mental impairment diagnosis is insufficient, standing alone, to establish entitlement to benefits.].

Although Plaintiff argues in his brief that the ALJ improperly assessed his subjective testimony, the undersigned does not find that the ALJ conducted an improper credibility analysis. To the contrary, the ALJ spent a considerable part of his opinion discussing why he found the extent of pain and limitation testified to by the Plaintiff to not be credible (no doubt because this was the reason the first decision had been remanded to the Commissioner). "When objective evidence conflicts with a claimant's subjective statements, an ALJ is allowed to give the statements less weight. SSR 96-7p, 1996 WL 374186 at * 1 (1996)." Patterson v. Astrue, No. 08-1065, 2009 WL 1586941 at * 7 (D.S.C. June 4, 2009).

> In determining the credibility of [a claimant's] statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

Id. (quoting SSR 96-7p).

The ALJ discussed Plaintiff's testimony that he has to take two to three hours during the course of the day to moisturize his stump, how he suffers from constant pain and could sit for only twenty to thirty minutes before he needs to move around, that he does not like to use his prosthesis because it makes him sore, and other complaints, finding that while Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, Plaintiff's testimony as to the intensity, persistence and limiting effects of these symptoms was not



13

credible when compared with the objective medical evidence showing a well healed stump with no indication of skin problems, that Plaintiff was capable of achieving independent ambulation with his prosthesis, that there was no evidence of atrophy in his muscle systems, that Plaintiff had himself been resistant to medications and treatment, that there was in fact no corroboration of any skin or moisturizing problem in the medical treatment notes, that Plaintiff had failed to attend scheduled visits with Dr. Waid, and that contrary to Plaintiff's testimony the medical examinations revealed no problems with Plaintiff's concentration and memory. (R.pp. 566-570). See generally Hunter 993 F.2d at 35 [ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints]; Jolley v. Weinberger, 537 F.2d 1179, 1181 (4th Cir. 1976) [finding that objective medical evidence, as opposed to the claimant's subjective complaints, supported an inference that he was not disabled]; Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]; Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990)[False or exaggerated responses are entitled to weight in determining whether an impairment exists]; Jenkins v. Bowen, 861 F.2d 1083, 1086 (8th Cir. 1988)[ALJ may consider evidence that a claimant has exaggerated his symptoms].

The ALJ further noted that Dr. Buncher's opinion that Plaintiff was "disabled" was from December 2002, not long after Plaintiff's operation; that the medical evidence, including Buncher's own statements, indicated that Plaintiff was expected to continue to improve; and that there was no medical evidence that Plaintiff continued to be wheelchair bound or that any disability he alleged continued for the requisite twelve month period following his surgery. (R.pp. 571-572). Again, no reversible error is seen in this conclusion. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th

14



Cir. 1964) [court scrutinizes the record as a whole to determine whether the conclusions reached are rational]; see also Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) [physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"].

With respect to Plaintiff's complaint concerning the hypothetical provided to the vocational expert, Plaintiff asserts that the ALJ's deletion of a cane requirement was improper and done merely to allow the VE to render an opinion that Plaintiff could work. Plaintiff further complains that the hypothetical to the VE did not adequately encompass his mental impairment. (R.pp. 714-715). However, the ALJ found that Plaintiff had only a mild restriction in his activities of daily living, with moderate difficulties in social functioning and concentration, persistence or pace. (R.pp. 563-564). These findings are consistent with the medical evidence; (R.pp. 261-264, 277-292, 477-479, 640); and the ALJ's limitation of the Plaintiff to a low stress setting with no more than occasional decision making or changes in the work setting and no exposure to the general public sufficiently encompassed these limitation. (R.pp. 565, 714); cf. Wood v. Barnhart, No. 05-432, 2006 WL 2583097 at * 11 (D.Del. Sept. 7, 2006) [By restricting plaintiff to jobs with simple instructions, the ALJ adequately accounted for plaintiff's moderate limitation in maintaining concentration, persistence or pace]; Smith-Felder v. Commissioner, 103 F.Supp.2d 1011, 1014 (E.D.Mich. June 26, 2000) [hypothetical question including work involving only a mild amount of stress and only "simple one, two, or three step operations" properly comports with findings of ALJ as to plaintiff's moderate limitations in concentration, social functioning, and tolerance of stress]. There was also no reversible error in the ALJ's failure to include a cane restriction in the hypothetical in light of the medical evidence and the ALJ's findings in his decision. Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; Lee v. Sullivan, 945 F.2d 687,



15

692 (4th Cir. 1991))[ALJ not required to include limitations or restrictions in his hypothetical question that he finds not to be supported by the record]; Ross v. Shalala, No. 94-2935, 1995 WL 76861, at * 2 (Feb. 24, 1995)[ALJ's decision upheld where the ALJ appeared to split the difference between physician's opinions]; Clarke v. Bowen, 843 F.2d 271, 272-273 (8th Cir. 1988)["The substantial evidence standard presupposes . . . a zone of choice within which the decision makers can go either way without interference by the Courts"].

While Plaintiff may disagree with the findings of the ALJ, the undersigned has previously concluded that these findings are supported by substantial evidence in the record as that term is defined in the applicable case law. Hence, the hypothetical given by the ALJ to the vocational expert was proper, and the undersigned finds no grounds in the ALJ's treatment of the vocational expert's testimony for reversal of the final decision of the Commissioner. See Martinez v. Heckler, 807 F.2d 771, 773 (9th Cir. 1986).

## Conclusion

Substantial evidence is defined as " ... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be **affirmed**.

16



The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

August 2, 2010
Charleston, South Carolina



## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).



18